IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
|     Plaintiff | : | No. 1:24-cv-02000 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| THE COMMONWEALTH OF | : | |
| PENNSYLVANIA, PENNSYLVANIA | : | |
| DEPARTMENT OF LABOR AND | : | |
| INDUSTRY, and PENNSYLVANIA | : | |
| DEPARTMENT OF HUMAN | : | |
| SERVICES, | : | |
|     Defendants | : | |

**MEMORANDUM**

Before the Court is a motion to dismiss (Doc. No. 12) Plaintiff United States of America

("Plaintiff")'s complaint (Doc. No. 1), filed by Defendants The Commonwealth of Pennsylvania

("Commonwealth"), Pennsylvania Department of Labor and Industry ("DLI"), and Pennsylvania

Department of Human Services ("DHS") (collectively, "Defendants").  For the following

reasons, the Court will grant the motion.

I.      **BACKGROUND**

A.      **Factual and Legal Background**[1]

Plaintiff brings this action pursuant to the Fair Housing Act ("FHA"), Title VII of the

Civil Rights Act of 1968, 42 U.S.C. §§ 3601 et seq., to challenge the application of Defendant

Commonwealth's statewide building code, alleging that it "discriminates based on disability

because it requires every 'community home' for persons with intellectual disabilities or autism to

---

[1] This background is drawn from Plaintiff's complaint (Doc. No. 1), the factual allegations of which the Court accepts as true for purposes of the pending motion to dismiss, see Kedra v. Schroeter, 876 F.3d 424, 434 (3d Cir. 2017), and includes provisions of the relevant statutes and regulations, as cited by Plaintiff in the complaint.

install automatic sprinkler systems" although such sprinkler systems "are not required for homes occupied by similarly sized households of persons without disabilities." (Doc. No. 1 ¶ 1.) Accordingly, Plaintiff asserts that "[t]his requirement effectively prohibits individuals with intellectual disabilities or autism who require 'care' to live in the community from living in broad categories of housing, including older multifamily housing." (Id.) As alleged by Plaintiff, "community homes" are the Commonwealth's "primary community residential program for persons with intellectual disabilities and autism who would otherwise be institutionalized." (Id. ¶ 2.) Plaintiff avers that such community homes provide in-home staffing and other supports that permit individuals with intellectual disabilities or autism to live in the community as independently as possible and notes that community homes are regulated by the Commonwealth and "must comply with numerous safety requirements, including fire safety requirements." (Id.)

Plaintiff alleges that, pursuant to the FHA, "building code requirements that apply only to persons with disabilities, and which do not apply to the general population, may be justified only if they are warranted by the unique and specific needs and abilities of residents with disabilities in the housing at issue"; however, Pennsylvania's statewide building code, the Uniform Construction Code ("UCC"), "requires every community home to install an automatic sprinkler system, regardless of the homes' age, the number of residents, or the residents' individual abilities, including their ability to evacuate the home in case of fire." (Id. ¶ 3.) Plaintiff asserts that "[o]ther single-family homes, including newly constructed homes, are not required to install automatic sprinklers if they are not occupied by individuals with disabilities who require 'care' to live in the community" and "[n]or are in-home day care centers with up to twelve children or older 'commercial' congregate living facilities, such as nursing homes, required to install automatic sprinklers." (Id.)

Defendant DLI is an agency of Defendant Commonwealth that Plaintiff alleges "enacted, interprets, and enforces" Pennsylvania's mandatory statewide building code, the UCC, 34 Pa. Code §§ 401.1 et seq. (2024).  (Id. ¶ 8.)  Plaintiff asserts that Defendant DHS "approves, funds, and regulates community homes for persons with intellectual disabilities or autism."  (Id. ¶ 9 (citing 55 Pa. Code §§ 6400.1 et seq. (2024)).)

A "community home" is defined as a "building or separate dwelling unit in which residential care is provided to one or more individuals with an intellectual disability or autism . . . ."  See 55 Pa. Code § 6400.4; (Doc. No. 1 ¶ 10).  Defendant Commonwealth funds community homes through its federally approved Medicaid Consolidated Home and Community-Based Services ("HCBS") Waiver.  (Doc. No. 1 ¶ 11.)  This Waiver "allow[s] States to use Medicaid funds to serve individuals with intellectual disabilities in the community and allow them to avoid institutionalization."  (Id.); see 42 U.S.C. § 1396n(c)(2)(C).  Community homes are operated by private provider agencies that are licensed by DHS to deliver HCBS Waiver services to eligible individuals.  See 55 Pa. Code §§ 6100.81–6100.85; (Doc. No. 1 ¶ 12).  Since February 1, 2020, each community home that opens under the Consolidated HCBS Waiver may have no more than four residents, although homes that opened before this date may have up to eight residents.  See 55 Pa. Code §§ 6100.444(a)–(b); (Doc. No. 1 ¶ 13).

Plaintiff alleges that "[a]s of 2023, there were approximately 5,600 community homes across Pennsylvania with over 12,000 residents with intellectual disabilities or autism."  (Id. ¶ 14.)  Plaintiff asserts that the average community home has 2.3 residents, although some have only one resident.  (Id.)  Community homes must be "integrated in the community," and their residents "shall have the same degree of community access and choice as an individual who is similarly situated in the community who does not have a disability and who does not receive an

HCBS." See 55 Pa. Code § 6100.443; (Doc. No. 1 ¶ 15). Plaintiff asserts that federal regulations also require community homes to support "full access of individuals receiving Medicaid HCBS to the greater community . . . to the same degree of access as individuals not receiving Medicaid HCBS." See 42 C.F.R. § 441.301(c)(4)(i); (Doc. No. 1 ¶ 15).

Plaintiff alleges that, to support the integration requirement, "community homes operate in existing single-family homes, townhomes, or apartments in residential neighborhoods to allow residents the opportunity to interact with nondisabled neighbors" and "are intended to look the same as surrounding homes or apartments occupied by non-disabled households." (Id. ¶ 16.) Plaintiff asserts that such community homes "operate much like any other household," where "[r]esidents typically cook and eat meals together, shop for groceries together, do laundry together, and engage in activities together (such as playing games, watching TV, or going on community outings)" and "do not lock their bedroom doors and are not limited to specific parts of the home." (Id. ¶ 17.) Further, Plaintiff avers that "[a]s in other households, residents pool their resources (including Supplemental Security Income and Supplemental Nutrition Assistance Program benefits) to pay for room and board." (Id.) Community homes are required to have at least one direct support staff in the home whenever residents are present unless the individual plan of a resident specifies that he or she may be left unsupervised for specific periods of time. See 55 Pa. Code § 6400.45; (Doc. No. 1 ¶ 18).

Community homes are regulated by DHS through its Office of Developmental Programs ("ODP") and those regulations include fire safety requirements. See 55 Pa. Code § 6400.61– 6400.217; (Doc. No. 1 ¶ 19). Those regulations provide that community homes must have smoke detectors, interconnected smoke detectors if the home serves four or more individuals or has three or more stories, and fire extinguishers, and must conduct unannounced monthly fire

4

drills, including at night. See 55 Pa. Code §§ 6400.110–6400.112; (Doc. No. 1 ¶ 19). Pursuant to those regulations, residents must be able to evacuate the home within two and one-half minutes or another period established by a fire safety expert. See 55 Pa. Code § 6400.112(d); (Doc. No. 1 ¶ 19). Plaintiff asserts that "[m]any individuals with intellectual disabilities or autism are able and can be trained to respond to emergencies and evacuate their homes to a designated meeting place or point of safety within two and one-half minutes." (Id. ¶ 20.) Plaintiff avers that "DHS regulations do not require community homes to install automatic sprinkler systems" as part of its monitoring and review of community homes and "ODP does not check to see if community homes have automatic sprinkler systems as part of its monitoring and review of community homes." (Id. ¶ 21.) Plaintiff alleges that "[i]n addition to its own regulatory requirements, DHS requires community homes to obtain from the local jurisdiction either a certificate of occupancy indicating compliance with applicable building codes or a letter stating that a certificate of occupancy is not required." (Id. ¶ 22.)

Pennsylvania's Construction Code Act required DLI to adopt a UCC "to insure uniform, modern construction standards and regulations" throughout the Commonwealth. See 35 Pa. C.S. § 7210.102(a)(3); (Doc. No. 1 ¶ 23). As alleged by Plaintiff, DLI enacted regulations establishing the UCC in 2004 and thereafter, all municipalities and local governments in Pennsylvania were required to adopt the UCC as their building code. (Id. ¶ 24.) Plaintiff asserts that the UCC incorporates model building codes developed by the International Code Council, including the International Building Code ("IBC") and the International Residential Code ("IRC"). (Id. ¶ 25.) Plaintiff avers that in July 2018, the Commonwealth adopted and incorporated parts of the 2015 version of the IBC into the UCC, and in December 2021, adopted and incorporated into the UCC the 2018 version of the IBC, which remains in effect. (Id. (citing

5

34 Pa. Code § 403.21(a)(1)).)  Plaintiff alleges that "[a]lthough the DLI enforces the UCC, the UCC's Review and Advisory Council selects which International Code Council model codes will be incorporated into the UCC."  (Id. n.1 (citing 35 Pa. C.S. §§ 7210.107–108).)  Plaintiff asserts that the Construction Code Act provides that local governments may either enforce the UCC themselves or enter into an agreement to have DLI do so and that "[m]ost local governments have chosen to enforce the UCC themselves."  (Id. ¶ 26 (citing 35 Pa. C.S. § 7210.501(b)(5)).)  Plaintiff avers that "regardless of whether they enforce the UCC themselves or choose to have DLI do so, local governments must follow the UCC requirements and may not exceed or deviate from them without DLI's authorization."  (Id. (citing 35 Pa. C.S. § 7210.503(j)(2)).)

Plaintiff alleges that "[a]lthough single-family homes and townhomes are typically governed by the IRC . . . DLI classifies a dwelling that is used as a community home for persons with disabilities as a 'building' subject to the IBC."  (Doc. No. 1 ¶ 27 (first citing 2018 IRC § R101.2 and then citing 2018 IBC § 101.2).)  Plaintiff avers that "[a]ccording to DLI, when a community home opens in a structure that was constructed and previously used as a private home, its 'use' or 'occupancy' has changed from a residential 'dwelling' subject to the IRC to an IBC 'Group R-3' occupancy, specifically a '[c]are facility[y] that provide[s] accommodations for five or fewer persons receiving care.'"  (Id. (citing 2018 IBC § 310.4).)  Plaintiff asserts that a community home with more than five residents is "classified as a Group R-4 '[c]ongregate care facilit[y]'" and that the owner or operator of a community home "must therefore bring the existing dwelling into compliance with all IBC code requirements for R-3 or R-4 occupancies, just as if the home were being newly constructed for that purpose."  (Id. (citing 2018 IBC § 310.5).)

Plaintiff avers that the IBC requirements for R-3 and R-4 occupancies "differ from, and

6

often significantly exceed, those for single-family homes and multifamily dwellings" and points to the fact that "R-3 and R-4 facilities must have fire walls with a fire resistance rating of two hours in several locations." (Id. ¶ 28 (citing 2018 IBC § 706.4).) Plaintiff asserts that, "[b]y contrast, under the IRC, a single-family home must be constructed with exterior walls with a fire resistance rating of only one hour." (Id. (citing 2018 IRC tbl. 302.1(1)).) Plaintiff alleges that "[f]urthermore, if a community home's bedrooms are considered 'sleeping units' under the IBC, the interior walls separating these bedrooms from other areas of the house would have to be reconstructed as '[f]ire partitions' with one-hour fire resistance ratings." (Id. (citing 2018 IBC §§ 420.1, 708.3).) Plaintiff asserts that "[b]ecause it is not typically feasible to bring an existing dwelling into compliance with these requirements, they effectively preclude community homes from operating in many existing homes in residential neighborhoods" and that this "directly undermine[s] the goal of deinstitutionalization by preventing the integration of persons with intellectual disabilities or autism into the community." (Id.)

Plaintiff avers that the IBC "has attempted to mitigate these housing barriers in part by creating a sub-category within the R-3 occupancy group that allows a 'care facilit[y] for five or fewer persons receiving care' to operate in a 'single-family dwelling' that complies with the IRC, but only if an automatic sprinkler system is installed." (Id. ¶ 29 (first citing 2018 IBC § 310.4.1 and then citing 2015 IBC 310.5.1).) Plaintiff asserts that "[a]ccordingly, unless an automatic sprinkler system is installed, a community home that serves five or fewer persons with intellectual disabilities may not operate in a single-family home or townhome." (Id.)

Plaintiff alleges that the automatic sprinkler requirement "applies only to single-family homes occupied by persons with disabilities who require 'care' to live in the community" and that "[s]ingle family homes occupied by households of five or fewer persons, without

7

disabilities, whether related or unrelated, are not required to install automatic sprinkler systems." (Id. ¶ 30.)  Plaintiff asserts that "[a]lthough the IRC requires all newly constructed single-family dwellings and townhomes to have automatic sprinklers, see 2018 IRC § R313.2, the Commonwealth declined to adopt this requirement."  (Id. (citing 35 Pa. C.S. § 7210.901(g)(2)).)  Plaintiff avers that the automatic sprinkler requirement "applies across the board to every community home, regardless of whether automatic sprinklers are warranted by the unique and specific safety needs and abilities of the residents in a particular community home."  (Id. ¶ 31.)

Plaintiff asserts that the IBC provision that permits R-3 "care facilities" to operate in "single-family dwellings" if they have automatic sprinklers does not apply to community homes located in multifamily housing and "[a]s a result, agencies that operate community homes in apartments must not only install automatic sprinklers but must also ensure that the apartment complies with all other applicable R-3 fire code requirements."  (Id. ¶ 32.)  Plaintiff avers that "it is typically not feasible to install an automatic sprinkler system in a single multifamily dwelling unit" and that "[o]ther R-3 code requirements may also be infeasible to comply with in older, existing multifamily dwellings."  (Id. ¶ 33.)  Plaintiff asserts that "[a] residential-grade 'NFPA 13D' automatic sprinkler system, i.e., one that can connect to the home's domestic water line and does not require a dedicated water sources, costs approximately $9,500 to install, depending on the size of the home" but "at least one water utility in the Commonwealth prohibits the installation of automatic sprinklers in residential dwellings that lack a dedicated water line or other water source, such as an on-site water tank."  (Id. ¶ 34.)  Plaintiff alleges that, when these requirements apply, they "raise the price of installing automatic sprinklers to approximately $30,000 or more, which is comparable to the cost of a commercial-grade automatic sprinkler system."  (Id.)

Plaintiff asserts that, in one case involving three proposed community homes, Aqua Pennsylvania, a water utility serving portions of 32 Pennsylvania counties, "required the homes to install a dedicated water line or other water source for the homes' NFPA 13D automatic sprinkler systems" and it did so pursuant to a "tariff" approved by the Commonwealth that "requires the water utility 'customer' to install, at their own expense, a separate water service line for any residential automatic sprinkler system." (Id. ¶ 35.)  As to the separate water service line, Plaintiff alleges:

> Aqua Pennsylvania required, among other things, the installation of an underground valve and provided a specific design for this valve.  This valve was not available for retail purchase and would have had to be custom-built, which would have taken up to a year.  To avoid this delay, the homes' owner obtained permission from Aqua to install water tanks in the homes to service the sprinkler system.  However, in two of the homes, the tanks were too large to be delivered through the house and into the basement.  Therefore, for one home, the owner constructed a new exterior entrance and staircase to the basement to allow for the delivery and installation of the water tank there.  In the other home, the owner installed the water tank in the garage.  This, however, required the installation of central heating in the garage to ensure that the tank and pipes did not freeze in the winter.

(Id. ¶ 36.)

Plaintiff asserts that DHS does not provide additional funding to community home provider agencies to cover the costs of the installation of automatic sprinkler systems and that "[t]hese costs are not incorporated or factored into the reimbursement rates for community homes or residents." (Id. ¶ 37.)  Plaintiff also alleges that "[m]ost automatic sprinkler systems installed in existing dwellings have exposed pipes lining the walls of hallways, living areas, and bedrooms" and "[t]hese pipes are often considered unsightly and/or reminiscent of the institutional facilities these homes were intended to replace." (Id.¶ 38.)  Plaintiff asserts that "[a]lthough in new construction, automatic sprinklers can be largely concealed from view by being placed behind walls or above the ceiling, doing so in existing homes is often cost-

prohibitive." (Id.)

Accordingly, Plaintiff alleges that "[a]n across-the-board requirement that homes serving persons with intellectual disabilities install automatic sprinkler systems operates to make unavailable or restrict housing for this population" in the following ways:

a.  First, this requirement effectively prohibits individuals with intellectual disabilities who require "care" from living in older multifamily housing because it is not typically feasible to install automatic sprinklers in a single apartment in a multi-family building.

b.  Second, this requirement may significantly restrict the availability of rental housing that may be used as community homes, because landlords may have financial incentives to refuse to allow automatic sprinklers to be installed.  In addition to making the homes less marketable to future tenants, automatic sprinklers require ongoing maintenance and servicing.

c.  Third, the significant cost of installing automatic sprinkler systems, particularly where a dedicated water source is required, may be cost-prohibitive for many provider agencies.  Other agencies may be forced to operate homes with greater numbers of residents to defray the cost of automatic sprinklers, resulting in less-individualized living arrangements for persons with intellectual disabilities.

(Id. ¶ 39.)

Plaintiff alleges that the Commonwealth has exempted other types of buildings from the automatic sprinkler requirement by way of local amendments to the IBC.  (Id. ¶ 40.)  As an example, Plaintiff asserts that "the Commonwealth exempts all R-3 and R-4 buildings from installing automatic sprinklers if they were constructed before April 9, 2004, and their use has not changed, but not if they are in residential dwellings."  (Id. (citing 35 Pa. C.S. §§ 7210.902(b)(2)(ii), 7210.103).)  Accordingly, Plaintiff avers that "nursing homes, assisted living facilities, and other congregate care facilities with as many as 16 residents that opened before April 2004 need not install automatic sprinklers, while community homes must do so regardless of when the home was constructed."  (Id.)  Plaintiff alleges that the Commonwealth also exempts in-home day care centers with up to twelve (12) children from the automatic sprinkler

requirement "even though a day care center, like a community home, constitutes a change in the 'use' or 'occupancy' of the dwelling that otherwise may trigger an automatic sprinkler requirement." (Id. ¶ 41 (citing 34 Pa. Code § 403.23).) Plaintiff also asserts that the Commonwealth exempts newly constructed homes from the automatic sprinkler requirement, and that "[t]hese exemptions appear to reflect a judgment that the costs and ramifications of requiring automatic sprinklers in these circumstances outweigh their benefits." (Id. ¶ 42.)

Plaintiff alleges that, although the UCC provides a variance process, the Commonwealth's regulations dictate that only an "owner or owner's agent" can seek a variance and therefore, "a provider agency that operates a community home may not seek a variance unless it also owns the home or is authorized by the owner to seek a variance on the owner's behalf." (Id. ¶ 43 (citing 34 Pa. Code § 403.122).) Plaintiff also asserts that many of the factors regarding whether to grant a variance "weigh against waiving or granting a reasonable accommodation to the automatic sprinkler requirement." (Id. (citing 34 Pa. Code § 403.122(g)).) Plaintiff points to one factor—"[t]he extent to which the granting of a variance . . . will pose a violation of the" UCC—as in direct conflict "with the duty to provide reasonable accommodations, which by their nature involve exemptions to generally applicable rules." (Id. (citing 34 Pa. Code § 403.122(g)(2)).)

Plaintiff asserts that in the spring of 2023, Whole Life Services, a nonprofit corporation licensed by DHS to serve individuals in the community pursuant to the HCBS Waiver, sought to open a community home in an existing one-story, single-family home in Hermitage, Pennsylvania. (Id. ¶ 44.) Plaintiff avers that Whole Life purchased the home, intended to serve a man with intellectual disabilities who could no longer live with his family, and brought the home into compliance with ODP's regulations regarding community homes. (Id.) Plaintiff

11

asserts that, at the time it sought approval for the home, Whole Life operated approximately seventeen (17) community homes in Hermitage and other municipalities in Mercer County, and for these homes, Hermitage and other local municipalities "issued letters stating that the home did not require a certificate of occupancy because it was a permitted use in the zoning district where it was located." (Id. ¶ 45.) Plaintiff alleges that Whole Life submitted the letters to DHS pursuant to a provision in the DHS ODP Regulatory Compliance Guide stating that "a certificate of occupancy was not required if 'otherwise noted by the municipality or township . . . that a certificate of occupancy is not required.'" (Id. (quoting DHS ODP Regulatory Compliance Guide 8 (Feb. 3, 2020 ed.)).) Plaintiff asserts that "[b]ased in part on these letters, ODP approved these homes." (Id.)

Plaintiff alleges that in 2022, after the adoption of the 2018 IBC into the UCC, Hermitage officials determined that the UCC required community homes to install automatic sprinklers and DLI confirmed to Hermitage that this was the case. (Id. ¶ 46.) Plaintiff asserts that subsequently, Hermitage and other municipalities in Mercer County concluded that the UCC required community homes to obtain certificates of occupancy "which could not be issued unless the home had an automatic sprinkler system" and "[w]ithout a certificate of occupancy, or a letter stating that one was not required, DHS would not allow the community home to begin operating." (Id.)

Plaintiff alleges that Whole Life requested a reasonable accommodation under the FHA relieving it from the automatic sprinkler requirement for the home it sought to open in Hermitage but "Hermitage, through its city solicitor, denied this request on grounds that it 'lacks any authority whatsoever under the UCC to grant an exception to one of its provisions' and 'lacks any ability to provide you with the relief that your letter is requesting.'" (Id. ¶ 47.) Plaintiff

12

asserts that the "process for installing an automatic sprinkler system—including locating and retaining a contractor, obtaining permits and a certificate of occupancy, and obtaining final DHS approval for the home—took approximately six months" and that "[d]uring this time, the prospective resident could not move into the home and in the interim had to live in an unlicensed setting with a family, where his behavioral issues worsened." (Id. ¶ 48.) Plaintiff avers that "DHS officials also expressed concern about the prospective resident living in an unlicensed setting." (Id.) Plaintiff further asserts that the solo resident at the recently-opened home can respond to a fire drill by evacuating to a point of safety outside the home in two and a half minutes, as required by DHS regulations. (Id. ¶ 49.)

Plaintiff alleges that another provider agency, Extraordinary Youth Program (EYP), applied to Hermitage's Board of Appeals for a variance to the automatic sprinkler requirement for a community home it sought to open in an existing one-story, single-family home and in its application stated "that 'we are getting referrals from individuals, their families and agencies that desperately need a place to live' but that EYP could not serve them 'due to us not being granted an Occupancy Permit.'" (Id. ¶ 50.) Plaintiff asserts that, as an alternative to the automatic sprinkler requirement, EYP "offered to limit the home to two residents, add additional staff, and install hard-wired smoke alarms" but the Board of Appeals "denied the variance request, citing state law." (Id.) Plaintiff avers that "[n]evertheless, in an apparent attempt to allow EYP to begin serving individuals with intellectual disabilities in the home without delay, the Board of Appeals voted to grant EYP a 'conditional' certificate of occupancy under which EYP was required to install an automatic sprinkler system within the next six months." (Id. ¶ 51.) Plaintiff alleges that "[s]imilarly, the City of Farrell, which is adjacent to Hermitage, issued 'conditional' occupancy certificates for two community homes operated by another provider

agency, Stock LLC, based on its agreement to install automatic sprinklers in the homes within six months." (Id.)  Plaintiff alleges that DHS approved the EYP home in Hermitage and one of the Stock LLC homes based on the "conditional certificates of occupancy" but about a month later, "DHS refused to approve the second home in Farrell operated by Stock LLC, on grounds that DHS needed a 'permanent' certificate of occupancy."    (Id. ¶ 52.)  Plaintiff asserts that as a result of this denial, the home remained empty for several months until an automatic sprinkler system and water tank were installed.  (Id.)

Plaintiff alleges that the above facts demonstrate that Defendants have violated the FHA by: (1) discriminating in the sale or rental, or otherwise making unavailable or denying, a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(1); (2) discriminating in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(2); and (3) refusing to allow for the provision of reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person an equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B), all of which constitute a "pattern or practice of resistance to the full enjoyment of rights granted by the FHA, or a denial of rights protected by the FHA to a group of persons, which denial raises an issue of general public importance, in violation of 42 U.S.C. § 3614(a)." (Id. ¶¶ 56–57.) Plaintiff asserts that "[c]urrent and prospective community home residents and community home provider agencies who have suffered harm and damages as a result of the actions described above may be 'aggrieved persons' within the meaning of 42 U.S.C. § 3602(i)." (Id. ¶ 58.)

**B.    Procedural Background**

Plaintiff's complaint seeks primarily declaratory and injunctive relief from this Court,

specifically: (1) a declaration "that the UCC's requirement that all community homes must install automatic sprinkler systems, as well as other heightened code requirements that operate to deny equal housing opportunity for persons with disabilities, violate the FHA"; (2) an injunction "[e]njoining Defendants, their agencies, officers, employees, agents, successors and all other persons in active concert or participation with it, from enforcing the UCC's automatic sprinkler requirement and other heightened code requirements for community homes, except where it has been demonstrated that installation of automatic sprinklers and/or any other heightened code requirement under the UCC is warranted by the unique and specific needs and abilities of the residents of a particular community home"; (3) an Order directing Defendants "to take all affirmative steps to comply with the FHA, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of the unlawful housing practices described above"; and (4) an award of "monetary damages pursuant to 42 U.S.C. § 3614(d)(1)(B) to all aggrieved persons."  (Doc. No. 1 at 21–22.)

Defendants filed a motion to dismiss the complaint (Doc. No. 12) on January 24, 2025, and submitted their brief in support of the motion on February 7, 2025 (Doc. No. 15). Defendants' motion argues, inter alia, that Plaintiff's complaint fails to state a claim for relief under the FHA and that the Court lacks subject matter jurisdiction over Plaintiff's claim because Plaintiff lacks standing to sue and asserts a claim that is not ripe.  After requesting an extension of time to respond, Plaintiff filed its brief in opposition to Defendants' motion on March 7, 2025. (Doc. No. 18.)  After also requesting an extension of time to file their reply brief, Defendants filed their reply brief on April 4, 2025.  (Doc. No. 24.)

On February 25, 2026, the Court issued an Order directing Plaintiff to file a supplemental brief addressing Defendants' standing and ripeness challenges to Plaintiff's request for

declaratory relief.  (Doc. No. 30.)[2]  Plaintiff filed its supplemental brief in accordance with the

Court's Order on March 11, 2026.  (Doc. No. 36.)  Defendants filed a responsive brief, in

accordance with the Court's Order, on March 25, 2026.  (Doc. No. 37.)  Accordingly,

Defendants' motion is ripe for disposition.

## II.    LEGAL STANDARDS

As noted, Defendants move to dismiss Plaintiff's complaint for a lack of subject matter

jurisdiction due to a lack of standing and ripeness under Federal Rule of Civil Procedure 12(b)(1)

and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 15 at 19–

36.)

### A.    Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), courts may dismiss a complaint for

a lack of subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  Because the issues of standing

and ripeness are a matter of subject matter jurisdiction, a motion to dismiss on those grounds is

properly brought pursuant to Federal Rule of Civil Procedure 12(b)(1).  See Ballentine v. United

States, 486 F.3d 806, 810 (3d Cir. 2007) (standing is a jurisdictional issue); Fernicola v. Borough

of Point Pleasant Beach, No. 22-cv-06971, 2025 WL 1245834, at *3 (D.N.J. Apr. 30, 2025)

(ripeness is a jurisdictional issue).

"A challenge to subject matter jurisdiction under Rule 12(b)(1) may be either a facial

attack or a factual attack."  Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016).

Distinguishing between the type of attack is "significant because, among other things, it

---

[2]  Specifically, the Court's Order directed the parties to address "Defendants' standing and ripeness challenges to Plaintiff's request for declaratory relief" particularly as "applied to each of the claims raised by Plaintiff's complaint—an FHA disparate treatment claim and a claim for denial of reasonable accommodations under the FHA."  (Doc. No. 30 at 1 & n.2.)

determines whether [the Court] accept[s] as true the non-moving party's facts as alleged in its pleadings." See In re Horizon Healthcare Servs. Data Breach Litig., 846 F.3d 625, 632 (3d Cir. 2017).  A facial attack "challenges subject matter jurisdiction without disputing the facts alleged in the complaint, and it requires the court to 'consider the allegations of the complaint as true.'" See Davis, 824 F.3d at 346 (quoting Petruska v. Gannon Univ., 462 F.3d 294, 302 n.3 (3d Cir. 2006)).  A factual attack, on the other hand, "attacks the factual allegations underlying the complaint's assertion of jurisdiction" and permits "'a court [to] weigh and consider evidence outside the pleadings.'"  See Davis, 824 F.3d at 346 (quoting The Constitution Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014)).

When a defendant files a motion challenging jurisdiction prior to filing an answer to the complaint, the motion is "by definition, a facial attack."  See Aichele, 757 F.3d at 358. Accordingly, Defendants assert a facial attack to the Court's subject matter jurisdiction over Plaintiff's complaint.  Therefore, the Court applies the Rule 12(b)(6) standard of review to Plaintiff's jurisdictional challenge.  See Aichele, 757 F.3d at 358 (stating that "a facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6)").[3]

### B.      Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a

---

[3]  In its brief in opposition to Defendants' motion, Plaintiff appears to characterize Defendants' jurisdictional challenge as a factual attack, see (Doc. No. 18 at 19); however, Defendants' challenge is clearly a facial one, and so the law cited by Plaintiff regarding a factual challenge to jurisdiction is inapposite.

plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure

8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled

to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure

12(b)(6) for "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P.

12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all

factual allegations in the complaint and all reasonable inferences that can be drawn from them,

viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618

F.3d 300, 312 (3d Cir. 2010).  The Court's inquiry is guided by the standards of Bell Atlantic

Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Under

Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of

pleading."  See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent

dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is

facially plausible.  See id.  The plausibility standard requires more than a mere possibility that

the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in Iqbal,

"where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to

relief.'"  See Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under Twombly and Iqbal, the

United States Court of Appeals for the Third Circuit ("Third Circuit") has identified the

following steps a district court must take under Rule 12(b)(6): (1) identify the elements a

plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the

complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded

18

factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Township, 629 F.3d 121, 130 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

## III.   DISCUSSION

As noted supra, Defendants seek dismissal of the complaint on several grounds.  The Court first sets forth the law applicable to FHA claims before addressing Defendants' arguments for dismissal.

### A.   Applicable Law

The stated policy behind the FHA is "to provide, within constitutional limitations, for fair housing throughout the United States."  See 42 U.S.C. § 3601.  Congress extended the FHA to protect against discrimination based on disability by way of the Fair Housing Amendments Act of 1988 ("FHAA").  See Revock v. Cowpet Bay West Condominium Ass'n, 853 F.3d 96, 104 (2017) (first citing City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 728 n.1 (1995) and then citing FHAA, Pub. L. No. 100–430, 102 Stat. 1619 (1988)).  Pursuant to the statute, it is unlawful:

> To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—
>
> (A) that person; or

19

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that person.

See 42 U.S.C. § 3604(f)(2).  In addition, pursuant to 42 U.S.C. § 3604(f)(3)(B), discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  See id.

"Plaintiffs alleging violations of the FHAA under these sections may bring three general types of claims: (1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make 'reasonable accommodations,' which arise under § 3604(f)(3)(B)." Community Services, Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 176 (3d Cir. 2005) (citing Lapid-Laurel, LLC v. Zoning Bd. Of Adjustment of the Twp. of Scotch Plains, 284 F.3d 442, 448 n.3 (3d Cir. 2002)).  To assess these claims, "courts have typically adopted the analytical framework of their analogues in employment law," including the relevant burden-shifting approach upon a prima facie showing of discrimination.  See id.

Plaintiff brings suit pursuant to 42 U.S.C. § 3614(a), which permits the Attorney General of the United States to commence a civil action whenever he or she "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by this subchapter" or "that any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general importance."  See 42 U.S.C. § 3614(a); (Doc. No. 1 ¶ 57).

**B.      Whether Plaintiff's Complaint is Subject to Dismissal**

Defendants raise four categories of arguments in support of their position that Plaintiff's

20

complaint is subject to dismissal: (1) the Court lacks subject matter jurisdiction; (2) the

complaint fails to state a claim under the FHA; (3) the complaint fails to allege that Defendants

are "persons" as defined by the FHA or that Defendants took any action prohibited by the FHA;

and (4) the complaint is barred by the doctrine of sovereign immunity.  The Court first addresses

Defendants' jurisdictional challenge.[4]

Defendants argue that Plaintiff's complaint suffers from jurisdictional defects,

specifically, lack of standing and ripeness.  Defendants assert that Plaintiff has not sufficiently

alleged standing in its complaint, noting that, "[t]o establish standing, Plaintiff must allege (and

ultimately prove) an injury that is traceable to the defendant's allegedly unlawful conduct and

that is likely to be redressed by the requested relief." (Doc. No. 15 at 32.)  Defendants argue that

"the FHA significantly limits the AG's ability to sue as a plaintiff and we've found no case

where the AG tried to sue (let alone succeeded in suing) a state for alleged violations of the

FHA."  (Id.)  Defendants maintain that:

> Plaintiff's concession that there are some 5,600 homes operating in Pennsylvania
> and the sparse reference to only a few alleged instances of the sprinkler requirement
> delaying/halting the potential operation of a home, means that the AG lacks
> standing to bring this action against Defendants because at best, all that has been
> alleged is sporadic and isolated incidents by municipalities.

(Id. at 32–33.)  Defendants assert that Pennsylvania's municipalities "make virtually all decisions

involving the application and enforcement of the building codes" and "[p]ut simply, no act of

Defendants has injured Plaintiff and no relief by Defendants will redress any supposed unlawful

---

[4]  Although Defendants do not raise their jurisdictional arguments at the outset of their brief, the
Court addresses them first because of the Court's obligation to satisfy itself that it has subject
matter jurisdiction over the dispute before addressing any arguments that the complaint fails to
state a claim upon which relief may be granted.  See Steel Co. v. Citizens for a Better Env't, 523
U.S. 83, 94–95 (1998) (holding that jurisdiction under Article III must be decided "as a threshold
matter").

conduct." (Id. at 33.)

Defendants also argue that Plaintiff's claims against Defendants are not ripe. (Id.) They maintain that the factual allegations of the complaint that "there are some 5,600 homes operating in Pennsylvania, one home allegedly didn't get approved for its 18th facility, and two others received a conditional approval and are operating don't show a ripe case vis-à-vis Defendants for violating the FHA." (Id. at 34.) Defendants argue that this is especially true because "it is the municipalities that make decisions on variances, there is a process to seek a variance, and an appellate process if such a variance is denied." (Id. (citing Texas v. U.S., 523 U.S. 296, 300 (1998)).)

Finally, Defendants argue that Plaintiff sued the wrong defendants, noting that it has sued the Commonwealth, DLI, and DHS for violating the FHA, and seeks forward-looking relief such as changes to Pennsylvania's UCC "even though it is the RAC (not Defendants) that decides what provisions of the ICC Codes are adopted as the UCC." (Id. at 34–35.)[5] Defendants further note that Plaintiff seeks a declaration that certain UCC provisions violate the FHA "if the application of the provision will 'operate to deny equal housing opportunity' and an injunction prohibiting enforcement of certain aspects of the UCC 'except where it has been demonstrated that installation' of such measures is 'warranted by the unique and specific needs and abilities of the residents of a particular' facility." (Id. at 35 (quoting Doc. No. 1 at 21–22).) Defendants argue that they "do not make decisions whether a particular building code provision 'operates' in a certain way or whether it has been 'demonstrated' to be 'warranted'—those calls are made by Pennsylvania's municipalities, not by Defendants." (Id. (citing Murthy v. Missouri, 603 U.S. 43,

---

[5] The Court notes that this argument is not a jurisdictional one, but because Defendants include it with their jurisdictional arguments, the Court includes it here.

57 (2024)).)

In its opposition brief, Plaintiff challenges Defendants' assertion that its FHA claims are not ripe by asserting simply that "[f]acial challenges to the legality of regulations 'are generally ripe the moment the challenged regulation or ordinance is passed.'" (Doc. No. 18 at 40 (quoting Suitim v. Tahoe Reg'l Planning Auth., 520 U.S. 725, 736 n.10 (1997)).) Accordingly, Plaintiff maintains that no "final decision" regarding any particular property is necessary to make Plaintiff's claims ripe. (Id.)

As Defendants note in their reply brief, Plaintiff in its opposition brief largely fails to respond to the substance of Defendants' lack of Article III standing argument; instead, Plaintiff merely characterizes Defendants' standing argument as a factual challenge to jurisdiction requiring the Court "to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the plaintiff's case." See (id. at 19 (quoting Davis, 824 F.3d at 348)). However, as noted supra, Defendants' motion clearly raises a facial, not a factual, challenge to Plaintiff's standing. See (Doc. No. 15 at 30–31).

Plaintiff also argues, contrary to Defendants' assertion that the RAC and/or municipalities are the proper defendants to Plaintiff's FHA claims, that its claims "arise from the UCC's text" and Defendant DLI is charged with enforcing the UCC. (Doc. No. 18 at 33.) In this regard, Plaintiff points to the complaint's allegation that DLI told the municipality of Hermitage that community homes must install sprinklers.[6] (Id. (citing Doc. No. 1 ¶ 46).) In addition, Plaintiff contends that "only the Commonwealth and DHS could be enjoined to approve community homes that do not comply with the UCC's sprinkler requirement." (Id.) Plaintiff

---

[6]  Plaintiff further states that "[b]ecause municipalities must follow the UCC, they would effectively be bound by injunctive relief against the Commonwealth and DLI enjoining enforcement of the UCC's sprinkler requirement against community homes." (Id. at n.11.)

also argues that, pursuant to state law, "[t]he RAC acts in tandem with DLI in the UCC rule-making process as delegated by the legislature" and "[t]hus, the RAC is not an independent 'third party' but acts on the Commonwealth's behalf." (Id. at 33–34 (citing Pennsylvania Builders Ass'n. v. Dep't of Labor & Indus., 4 A.3d 215, 222 (Pa. Commw. Ct. 2010)).) In addition, Plaintiff maintains that "just as courts may enjoin states and cities from enforcing unconstitutional or illegal laws enacted by their legislative branches, so too may this Court enjoin the Commonwealth and its agencies from enforcing discriminatory code requirements recommended by the RAC." (Id. at 34.)

As noted supra, upon review of the principal briefing on Defendants' motion, and given the limited nature of the parties' briefing related to the application of the jurisdictional doctrines of standing and ripeness to this case seeking declaratory and injunctive relief, the Court directed the parties to file supplemental briefs "addressing Defendants' standing and ripeness challenges to Plaintiff's request for declaratory relief" (Doc. No. 30 at 1), and noted that the briefs should address standing and ripeness "as applied to each of the claims raised by Plaintiff's complaint—an FHA disparate treatment claim and a claim for denial of reasonable accommodations under the FHA." (Id. at n.2 (citing Doc. No. 18 at 17 & n.2 (Plaintiff stating in its opposition brief that its complaint asserts FHA disparate treatment and denial of reasonable accommodations claims but not an FHA disparate impact claim)).)

As an initial matter, in its supplemental brief, Plaintiff "respectfully clarifies that it brought a single claim in this action." (Doc. No. 36 at 2.) Plaintiff states that its opposition brief "imprecisely used the term 'claim' when referencing disparate treatment and denial of reasonable accommodations,[] but they are not stand-alone claims"; instead, "they are theories of liability the United States will use to prove that either a pattern or practice of discrimination exists or that

24

a group of persons have been denied rights guaranteed by the FHA." (Id. at 2–3 (footnote omitted).)

As to the issue of standing, Plaintiff asserts that it "did not fail to address Defendants' standing arguments or waive arguments that it has standing under Article III," maintaining that "[t]he United States is injured whenever federal law is violated, and Congress explicitly authorized the Attorney General to redress some injuries through federal courts, including—as here—when the preconditions for Section 3614(a) are met"; accordingly, Plaintiff contends that "[t]hat statutory authorization gives the United States Article III standing to bring this claim and seek declaratory relief." (Id. at 3–4.) Plaintiff maintains that "the United States stands on different footing than a private plaintiff" because "[a] violation of federal law is, on its own, an injury to the United States, particularly where, as here, the statute specifically authorizes it to file suit and seek relief." (Id. at 6.) Plaintiff cites a string of cases in support of its statement as follows:

> United States v. City of Pittsburgh, 757 F.2d 43, 44–45 (3d Cir. 1985) (holding United States' assertion that city tax interferes with operation of federal judicial system alleges "an injury to its sovereign rights sufficient to have standing to sue in the district court"); United States v. Lewisburg Area Sch. Dist., 539 F.2d 301, 305 (3d Cir. 1076) ("It has long been established that the United States may bring suit to protect its sovereign interest notwithstanding the lack of any immediate pecuniary interest in the outcome of the litigation."); United States v. Yarbrough, 452 F. App'x 186, 189 (3d Cir. 2011) ("The Government doubtlessly suffers an 'injury in fact' when a defendant violates its criminal laws . . . Because the Government has standing to enforce its own laws, Yarbrough's argument that the Government has failed to allege an injury in fact is frivolous.") (citing Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (noting Government suffers injury to its sovereignty "arising from violation of its law")); United States v. AION Mgmt., LLC, No. 23-cv-00742, 2025 WL 843 620, at *8 (D. Del. Mar. 18, 2025) ("Nevertheless, and undeniably, the United States suffers an Article III injury in fact when its laws are violated.").

(Doc. No. 36 at 6–7.) Plaintiff maintains that courts generally hold that the United States has standing when it asserts claims under specific statutory authority, citing as examples United

States v. Mattson, 600 F.2d 1295, 1297 (9th Cir. 1979) and United States v. City of Parma, Ohio,

661 F.2d 562, 572 (6th Cir. 1981).  (Doc. No. 36 at 7.)

Plaintiff contends that "[a]lthough the United States is injured whenever a federal law is

violated, the Attorney General is limited in which of those injuries it can bring to federal courts"

but:

> Congress explicitly authorized the Attorney General to seek redress from federal
> courts whenever the conditions for a Section 3614(a) claim are satisfied, i.e.
> whenever she has reasonable cause to believe that someone is engaged in a pattern
> or practice of resistance to the full enjoyment of federal fair housing rights, or that
> a group of persons has been denied their federal fair housing rights and that denial
> raises an issue of general public importance.

(Id. at 7–8.)  Accordingly, Plaintiff maintains that the United States possesses Article III standing

here because "the complaint alleges sufficient facts to meet the statutory requirements for the

United States' Section 3614(a) claim."  (Id. at 8.)

In addition, Plaintiff contends that it has standing to bring this case pursuant to traditional

Article III standing analysis "because it has suffered a concrete injury-in-fact that was caused by

Defendants and is redressable by this Court."  (Id.)  As to injury, Plaintiff asserts that the "United

States suffers an injury-in-fact whenever federal laws are violated."  (Id. at 9.)  Plaintiff further

argues that its complaint alleges "concrete, ongoing violations of federal law—specifically,

Defendants' disparate treatment violations of Section 3604(f)(1)–(2)" and "reasonable

accommodations violations of Section 3604(f)(3)(B)" which "resulted in a violation of Section

3614(a)", amounting to a sufficient allegation that it suffered an injury-in-fact.  (Id.)

Plaintiff also maintains that it alleges facts showing that its injury is caused by

Defendants, arguing that:

> it was injured because Defendants, through the UCC and through the actions of DLI
> and DHS, have imposed blanket requirements on community homes because their
> residents have disabilities . . . precluded community homes from opening unless

26

they met costly and sometimes infeasible requirements because their residents have disabilities . . . and precluded municipalities from granting reasonable accommodations from these heightened requirements in appropriate circumstances.

(Id. at 9–10.)  Plaintiff contends that "Defendants have put municipalities in an impossible situation, forcing them to choose between implementing and enforcing the UCC's blanket sprinkler requirement for all community homes and violating the federal FHA . . . or flouting the UCC's requirement and violating the UCC."  (Id. at 10.)  Plaintiff argues that the complaint alleges facts supporting causation for "injuries caused by DLI and DHS specifically."  (Id.)  As to DLI, Plaintiff asserts that the complaint alleges that it:

> (a) enacted, interprets, and enforces the UCC . . .; (b) enacted regulations establishing the UCC . . .; (c) classifies community homes as "buildings" rather than residences, subjecting them to heightened code requirements . . .; (d) determines that the "use" or "occupancy" of a house changes from a residential "dwelling" in a "Group R-3" occupancy when it transitions from a private home to a community home, subjecting it to heightened code requirements . . .; and (e) after the UCC was amended in 2022, confirmed to a municipality that the UCC required community homes to install automatic sprinklers . . . .

(Id.)  As to DHS, Plaintiff points to the complaint's allegations that DHS "(a) approves, funds, and regulates community homes . . .; (b) requires community homes to obtain a certificate of occupancy indicating compliance with applicable building codes or a letter stating no certificate of occupancy is needed . . .; and (c) refuses to approve community homes until the local jurisdiction issues a permanent certificate of occupancy . . . ."  (Id. at 10–11.)  Accordingly, Plaintiff argues that the complaint alleges that DLI and DHS "were responsible for implementing UCC requirements in a manner that directly injured community homes and violated the FHA."  (Id. at 11.)

Plaintiff also argues that it has pleaded an injury that is redressable by this Court. Plaintiff contends that "the non-monetary relief[] requested by the United States is appropriate and will redress injuries that Defendants caused."  (Id. (footnote omitted).)  First, Plaintiff

27

maintains that Defendants mischaracterize the relief sought by it, pointing to the complaint's request that the Court order "Defendants to take all affirmative steps to comply with the FHA, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of the unlawful housing practices described above." (Id. at 11–12.)  Plaintiff argues that "[w]hether any Defendant may amend the UCC may be a question for discovery, but it is irrelevant to the United States' standing, especially when the United States has not sought any such relief." (Id. at 12.)  Second, Plaintiff contends that "Defendants try to undercut the declaratory and injunctive relief sought by the United States by arguing that it requests relief regarding 'how codes are applied to applications' and asks Defendants to 'make decisions whether a particular building code provision "operates" in a certain way or whether it has been "demonstrated" to be "warranted."'" (Id.)  However, Plaintiff maintains that it "seeks only a declaration 'that the UCC's requirement that all community homes must install automatic sprinkler systems, as well as other heightened code requirements that operate to deny equal housing opportunity for persons with disabilities, violate the FHA.'" (Id.)  In Plaintiff's view, "the declaration the Court ultimately enters will be grounded in the fact-finder's determination, after discovery and trial, of what violates the FHA." (Id.)

Plaintiff notes that it seeks injunctive relief "[i]n tandem with" its request for declaratory relief, stating that its complaint "asks the Court to enjoin Defendants and those acting in concert with them from enforcing heighted [sic] UCC requirements for community homes except where they are warranted by the specific needs and abilities of the residents." (Id. at 13.)  Plaintiff states that the injunction sought by it would prevent DHS from withholding a license from a community home because it does not have a sprinkler system and so "municipalities will be free to make appropriate decisions about each community home based on its specific circumstances,

28

rather than being required to impose unwarranted heightened UCC requirements and prevented from granting reasonable accommodations." (Id.)  Plaintiff acknowledges that "[a]lthough this relief will not repeal the UCC's heightened code provisions, and the Court's order would not bind local jurisdictions,[] it will fully address the United States' injuries because it will declare the discriminatory UCC requirements invalid and enjoin Defendants from enforcing them." (Id. at 13–14 (footnote omitted).)  Accordingly, Plaintiff maintains that it has standing to bring its claim.

Plaintiff's supplemental brief minimally addresses the issue of ripeness, stating little more than "Defendants' argument that the United States' claim is not ripe is essentially the same as their standing argument—that any violations of the FHA are speculative or caused by others" but "the United States does not bring a pre-enforcement challenge to a new law with one enforcer and no imminent threat of enforcement" because Plaintiff's complaint alleges "an ongoing violation caused by Defendants that has injured the United States and will continue to do so until it is redressed by this Court." (Id. at 14–15.)

As to the issue of Plaintiff's standing, Defendants in their responsive supplemental brief contend that Plaintiff's argument that it has standing "is wholly unsupported by any authority." (Doc. No. 37 at 9.)  Defendants assert that Plaintiff's contention that the United States government stands on different footing than the typical plaintiff in terms of standing is "irrelevant," because the problem with Plaintiff's "circular contention" that "since it has alleged a violation of the Fair Housing Act (FHA) it can bring this civil action against the Commonwealth pursuant to 42 U.S.C. § 3614(a)" is that Plaintiff "cites no precedent authorizing the Federal Government (in a civil action brought by the Attorney General) to sue a State (or a State Agency) pursuant to 42 U.S.C. § 3614(a)." (Id.)  Defendants argue that Plaintiff supports

its theory that the United States is injured (for standing purposes) by any violation of federal law by "cobbling together cherry-picked quotes from readily distinguishable cases," none of which involve a state as a defendant to a claim of violation of 42 U.S.C. § 3614(a).  (Id. at 9–10 (distinguishing cases cited by Plaintiff in support of its theory of standing).)  Defendants note that Plaintiff's supplemental brief clarifies that Plaintiff brings a single claim that the Commonwealth has violated Section 3614(a) of the FHA, as Plaintiff "affirmatively disavows other parts of the FHA as the basis for its affirmative litigation against the Commonwealth."  (Id. at 11–12.)[7]

Defendants argue that Plaintiff's complaint is "wholly insufficient because it fails to name or acknowledge the role of other entities in the adoption and enforcement of Pennsylvania's building codes."  (Id. at 16.)  Defendants contend that Plaintiff's supplemental brief, like its opposition brief, "completely ignores numerous admissions it has made since the beginning of this case" (id. at 17), stating that the complaint alleges that: "as of 2023, there were 'approximately 5,600 community homes across Pennsylvania with over 12,000 residents with intellectual disabilities or autism'" (id. (quoting Doc. No. 1 ¶ 14)); the Review and Advisory Council "selects which parts of the UCC will be adopted in Pennsylvania" (id. at 17–18 (citing Doc. No. 1 ¶ 25 n.1)); "[m]ost Pennsylvania municipalities have decided to enforce the UCC in their respective jurisdictions" (id. at 18 (citing Doc. No. 1 ¶ 26)); and "Pennsylvania law provides for a process to vary from any UCC requirement—including any 'requirement' for automatic sprinklers or other heightened safety measures" (id. at 18 (citing Doc. No. 1 ¶ 43)).

---

[7]  Defendants note that, in Plaintiff's opposition brief, Plaintiff referenced 42 U.S.C. § 3615 and several cases addressing preemption pursuant to that provision; however, the complaint "assert[s] no § 3615/preemption/Supremacy Clause claim against the Commonwealth—a point made crystal clear in [Plaintiff's] [s]upplemental [b]rief."  (Id. at 12 n.4.)

Defendants argue that Plaintiff "utterly fails to acknowledge the responsibility of every opt-in municipality to consider and decide applications for variances, and [Plaintiff] does not allege that anybody has sought, or been denied, a variance." (Doc. No. 37 at 18.)  Defendants contend that the complaint:

> contains absolutely no factual allegation about any of the 5,600 operational homes—nothing as to whether they are located in municipalities where the Commonwealth (as opposed to a municipality) enforces the UCC, nothing as to whether these operations were required to install automatic sprinkler systems before starting business operations or whether they sought or obtained waivers/variances from doing so, nothing as to the costs of such systems (if installed), nothing as to the impact of installing such systems on these businesses, and nothing as to the impact of installing such systems on the supply of such facilities in Pennsylvania.  Instead, [Plaintiff] merely points to three providers— Whole Life, Extraordinary Youth Program ("EYP"), and Stock LLC; however, these providers, too, are operating their community homes.

(Id. at 18–19.)  Accordingly, Defendants maintain that the complaint fails to allege any action by Defendants "that has denied any community home provider the ability to operate or has otherwise reduced the number of community homes in Pennsylvania" or that "the Commonwealth is imminently going to take any such action resulting in such consequences" and so Plaintiff's claim "is barred by the doctrines of standing and ripeness."  (Id. at 19.)

Finally, Defendants argue that the relief sought by the complaint "also undermines the justiciability of Plaintiff's single § 3614(a) claim" (id. at 20), noting that the complaint seeks:

> (1) a declaration "that the UCC's requirement that all community homes must install automatic sprinkler systems, as well as other heightened code requirements that operate to deny equal housing opportunity for persons with disabilities, violate the FHA"; (2) an order enjoining the Commonwealth "from enforcing the UCC's automatic sprinkler requirements and other heightened code requirements for community homes, except where it has been demonstrated that installation of automatic sprinklers and/or any other heightened code requirement under the UCC is warranted by the unique and specific needs and abilities of the residents of a particular community home"; and (3) an affirmative injunction compelling the Commonwealth to "take all affirmative steps to comply with the FHA, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of the unlawful hiring

<u>practices described above</u>."

(Id. (quoting Doc. No. 1 WHEREFORE clauses (a,b,c)).)  Defendants maintain that the relief

sought by Plaintiff is "quintessential 'as-applied' relief," contrary to Plaintiff's description of the

relief sought as "facial," noting that Plaintiff "is not asking that the automatic sprinkler or other

heightened safety measures be invalidated and enjoined" but rather:

> merely asks for a declaration that these measures violate the FHA when they "operate to deny" equal housing opportunities, a negative injunction against enforcement of these safety measures unless such safety measures are "warranted by the unique and specific needs and abilities of the residents of a particular home", and an affirmative injunction preventing "discriminatory conduct in the future" and eliminating– "to the extent practicable" –the effects of unlawful housing practices.

(Id. at 21.)

Defendants describe the legal difference between "facial" and "as-applied" relief and

contend that the relief sought by Plaintiff involves "fact-specific future inquiries and the

resolution of these questions will be made, not by the Commonwealth, but by municipalities and

their duly appointed appeals boards reviewing information submitted by putative providers" and,

as to the need for potential injunctive relief, it is "completely dependent on future individualized

municipal decisions regarding whether certain safety measures for these facilities are warranted."

(Id. at 22–23.)  Accordingly, Defendants maintain that this constitutes "as-applied" relief sought

"without a single factual allegation that the Commonwealth has taken (or will immediately take)

any action to deny or hinder the operation of any community home" and despite Plaintiff's

concession that "there are nearly 5,600 community homes currently operating in Pennsylvania."

(Id. at 23.)  For the above reasons, Defendants contend that Plaintiff's complaint is subject to

dismissal on standing and ripeness grounds.[8]

---

[8]  Shortly after Defendants filed their responsive supplemental brief, Plaintiff filed a notice of supplemental authority regarding its opposition to Defendants' motion to dismiss (Doc. No. 38),

Article III of the Constitution limits the federal judiciary's jurisdiction to actual "cases or controversies." See U.S. Const. art. III, § 2. "The existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief." Presbytery of the Orthodox Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994) (citing Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83 (1993) and Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950)). Courts "enforce [this requirement] 'through the several justiciability doctrines that cluster about Article III,' including 'standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions.'" See Plains All Am. Pipeline L.P. v. Cook, 866 F.3d 534, 539 (3d Cir. 2017) (quoting Toll Bros., Inc. v. Township of Readington, 555 F.3d 131, 137 (3d Cir. 2009)). Non-justiciable claims are not properly suited for resolution by federal courts. See, e.g., Rucho v. Common Cause, 588 U.S. 684, 718 (2019) (finding claim of partisan gerrymandering to be non-justiciable political question). Accordingly, a court may dismiss such claims for lack of subject-matter jurisdiction. See Fed. R. Civ. P. 12(b)(1); Long v. Se. Pa. Transp. Auth., 903 F.3d 312, 320 (3d Cir. 2018). The Court must "presume that [it] lack[s] jurisdiction unless the contrary appears affirmatively from the record." See Renne v. Geary, 501 U.S. 312, 316 (1991) (internal quotation marks and citations omitted). Further, "[i]t is the plaintiff['s] responsibility to clearly allege facts that invoke the court's

---

directing the Court to a recently-issued opinion of the Eleventh Circuit Court of Appeals in United States v. Florida, No. 23-12331, 2026 WL 879178 (11th Cir. Mar. 31, 2026) and representing that "[t]his opinion is relevant to the United States' standing to bring its Fair Housing Act claim against the Defendants in this case." (Doc. No. 38 at 1.) In Florida, the Eleventh Circuit stated, in connection with claims brought by the United States alleging violation of the Americans with Disabilities Act related to the institutionalization of children with medically complex conditions, that "Florida seems to misunderstand the general principles that govern the ability of the United States to sue in its sovereign capacity to enforce federal law" and that the "United States generally has standing to sue when it alleges an 'injury to its sovereignty arising from violation of its laws.'" See Florida, 2026 WL 879178, at *10.

jurisdiction." See Phila. Fed'n of Teachers, Am. Fed'n of Teachers, Local 3, AFL-CIO v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998) (citing Renne, 501 U.S. at 316).

The Court first addresses Defendants' ripeness challenge to Plaintiff's "single claim." See (Doc. No. 31 at 2 (Plaintiff clarifying that it asserts only a "single claim in this action")). "To determine if a claim is ripe, [the Court] consider[s] whether the parties are in a sufficiently adversarial posture, whether the facts of the case are sufficiently developed, and whether a party is genuinely aggrieved." Mazo v. New Jersey Sec'y of State, 54 F.4th 124, 135 (3d Cir. 2022) (internal quotation marks and citations omitted). Further, "[i]n the declaratory judgment context, [the Court] appl[ies] these principles by considering three enumerated factors: '(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment.'" See id. (quoting Khodara Envt'l, Inc. v. Blakey, 376 F.3d 187, 196 (3d Cir. 2004)); see also Plains, 866 F.3d at 540 (stating that "we consider related claims for declaratory and injunctive relief under the same [three-factor] test"). This test "was first articulated in [the Third Circuit's] decision in Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643 (3d Cir. 1990)" and is known as the "Step-Saver test." See Plains, 866 F.3d at 539–40.

The Court notes that, despite its Order requesting supplemental briefing "addressing Defendants' standing and ripeness challenges to Plaintiff's request for declaratory relief," see (Doc. No. 30 at 1), Plaintiff in its supplemental brief spends no more than three sentences addressing the issue of ripeness in the specific context of the declaratory relief sought by it in this case.[9] The Court also notes that Plaintiff has not identified a similar case brought by the

---

[9] As noted, in their supplemental brief, Defendants argue that "the requested relief also undermines the justiciability of [Plaintiff's] single § 3614(a) claim against the Commonwealth." (Doc. No. 37 at 19–20.) Defendants quote the relief sought by Plaintiff in the wherefore clause of its complaint and state that "[c]ontrary to its 'facial' rhetoric—the [Plaintiff] uses the term more than 20 times in its Opposition Brief—these are requests for quintessential 'as-applied'

Attorney General against state agencies alleging violation of § 3614(a) of the FHA and seeking

declaratory and injunctive relief.  Although Plaintiff does not assert jurisdiction pursuant to the

Declaratory Judgment Act and instead asserts jurisdiction pursuant to the FHA, the primary relief

sought in this case is declaratory and injunctive.  As noted supra, Plaintiff's complaint seeks an

order "[d]eclaring that the UCC's requirement that all community homes must install automatic

sprinkler systems, as well as other heightened code requirements that operate to deny equal

housing opportunity for persons with disabilities, violate the FHA."  (Doc. No. 1 at 21.)  The

complaint seeks accompanying injunctive relief, as follows:

> [e]njoining Defendants, their agencies, officers, employees, agents, successors and all other persons in active concert or participation with it, from enforcing the UCC's automatic sprinkler requirement and other heightened code requirements for community homes, except where it has been demonstrated that installation of automatic sprinklers and/or any other heightened code requirements under the UCC is warranted by the unique and specific needs and abilities of the residents of  a particular community home; . . .  [and] [o]rdering Defendants to take all affirmative steps to comply with the FHA, including steps necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate to the extent practicable the effects of the unlawful housing practice described above.

(Id. at 21–22.)[10]  Accordingly, despite the fact that the parties do not identify the Step-Saver test

in their supplemental briefs, because the principal relief sought by way of Plaintiff's "single

claim" is declaratory and injunctive, and the Third Circuit has stated that "we consider related

claims for declaratory and injunctive relief under the same [three-factor] test," see Plains, 866

F.3d at 540, the Court sees no reason why the Step-Saver three-part test would not apply in this

case to assess the ripeness of Plaintiff's claim.[11]  Mindful of its obligation to ensure that it

_____

relief."  (Id. at 20–21.)

[10]  Although Plaintiff's complaint also seeks "monetary damages pursuant to 42 U.S.C. § 3614(d)(1)(B) to all aggrieved persons," (Doc. No. 1 at 22), the complaint does not identify any aggrieved persons.

[11]  In SWN Production Company, LLC v. Blue Beck Ltd., No. 22-cv-00091, 2023 WL 6609019

possesses jurisdiction over this dispute, the Court below applies the Step-Saver three-factor test

to analyze the ripeness of Plaintiff's "single claim" seeking declaratory and injunctive relief.[12]

(Doc. No. 31 at 2.)

The Step-Saver test first analyzes the "adversity" of the parties' interest, and although a

plaintiff seeking declaratory relief "need not suffer a completed harm to establish adversity of

interest," it "must demonstrate that the probability of that future event occurring is real and

substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment." See Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local

Union No. 66, 580 F.3d 185, 190 (3d Cir. 2009) (citations and alterations omitted). "[A]

potential harm that is 'contingent' on a future event occurring will likely not satisfy this prong of

the ripeness test." Id. (citing Step-Saver, 912 F.2d at 647–48).

Upon careful review of Plaintiff's complaint and the briefs of the parties, the Court finds

---

(M.D. Pa. 2023), another judge of this Court addressed a defendant's argument that the Step-Saver test did not apply to claims for declaratory relief outside of the First Amendment free speech pre-enforcement context and concluded that the application of the test was not so limited, stating that "Step-Saver itself was not a First Amendment case, nor were other cases applying its test." See id. at *4 n.3. In addition, the Court addressed the defendant's reliance on Peachlum v. City of York, 333 F.3d 429 (3d Cir. 2003), and noted that the Third Circuit in that case "observed that the Step-Saver test 'is tailored to address pre-enforcement actions,' as opposed to post-enforcement actions, but it did not hold that the test is limited to pre-enforcement actions challenging the validity of a statute." See SWN Production Co., LLC, 2023 WL 6609019, at *4 n.3 (quoting Peachlum, 333 F.3d at 435).

[12] In Plains, the Third Circuit noted that, in Abbott Laboratories v. Gardner, 387 U.S. 136 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) ("Abbott Labs"), "the Supreme Court laid out two principal considerations for gauging ripeness including (1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'" See Plains, 866 F.3d at 539 (quoting Abbott Labs, 387 U.S. at 149). The Third Circuit also noted that "although our Step-Saver test differs in form from the ripeness test articulated in Abbott Labs . . . it is merely a different framework for conducting the same justiciability inquiry," and "when we apply Step-Saver, Abbott Labs's 'hardship' and fitness' factors still guide our analysis . . . ." See id. at 540.

36

that Plaintiff's complaint fails to allege facts plausibly suggesting sufficient adversity of interest between the parties to satisfy the first factor of the Step-Saver ripeness test.  Although Plaintiff argues that it has already suffered injury due to enforcement of the automatic sprinkler requirement, see (Doc. No. 36 at 9–11), paragraph 39 of Plaintiff's complaint summarizes the injury of which Plaintiff complains as that the Commonwealth's UCC building code provision imposing an automatic sprinkler requirement on "care" facilities restricts housing for people with intellectual disabilities in the following ways:  (1) by "effectively prohibiting individuals with intellectual disabilities who require 'care' from living in older multifamily housing because it is not typically feasible to install automatic sprinklers in a single apartment in a multi-family building"; (2) because it "may significantly restrict the availability of rental housing that may be used as community homes, because landlords may have financial incentives to refuse to allow automatic sprinklers to be installed"; and (3) the automatic sprinkler requirement "may be cost-prohibitive for many provider agencies" and "[o]ther agencies may be forced to operate homes with greater numbers of residents to defray the cost of automatic sprinklers".  (Doc. No. 1 ¶ 39 (emphasis added).)  In the Court's view, the injury or injuries that Plaintiff seeks to address by way of its complaint are couched in decidedly conjectural terms about circumstances that may result in the restriction or unavailability of homes for persons with intellectual disabilities or autism.  These alleged injuries simply fail to "demonstrate that the probability of that future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  See Pittsburgh Mack Sales & Serv., Inc., 580 F.3d at 190.  The Court also notes that paragraph 14 of Plaintiff's complaint acknowledges the significant number of community homes serving individuals with intellectual disabilities or autism in Pennsylvania, alleging that "[a]s of 2023, there were approximately 5,600 community homes

37

across Pennsylvania with over 12,000 residents with intellectual disabilities or autism." (Doc. No. 1 ¶ 14.) In the Court's view, the allegations of Plaintiff's complaint do not sufficiently allege adversity of interest because they do not plausibly allege that "harm will result if the declaratory judgment is not entered." See Plains, 866 F.3d at 541 (quoting Travelers Ins. Co. v. Obusek, 72 F.3d 1148, 1154 (3d Cir. 1995)). The Court turns to the second factor of the Step-Saver test.

The second factor of the Step-Saver test assesses the "conclusiveness" of any judgment. See id. at 540. "Conclusiveness is a short-hand term for whether a declaratory judgment definitively would decide the parties' rights." N.E. Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 344 (3d Cir. 2001) (citing Step-Saver, 912 F.3d at 648). Under the second Step-Saver factor, courts consider whether the dispute "is based on 'a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be in a hypothetical set of facts.'" See Plains, 866 F.3d at 542–43 (citation omitted). "[T]wo concerns are paramount." Id. at 543. First, courts consider "whether 'the legal status of the parties' will 'be changed or clarified.'" See id. (quoting Travelers Ins. Co., 72 F.3d at 1155). Second, courts "ask 'whether further factual development . . . would facilitate decision' or [whether] 'the question presented is predominantly legal.'" See id. (quoting N.E. Hub Partners, 239 F.3d at 344).

First assessing the second concern of this factor, the Court finds Defendants' position that Plaintiff's complaint seeks as-applied, fact-bound relief, as opposed to "predominantly legal" relief, to be well-taken. As an initial matter, the Court notes that Plaintiff's very limited argument in its initial brief in support of the ripeness of its unique claim contends that it asserts a "facial" challenge to the automatic sprinkler regulation. See, e.g., (Doc. No. 18 at 21 (Plaintiff

38

stating that "the UCC's automatic sprinkler requirement is facially discriminatory"), 22 (Plaintiff citing cases finding regulations facially discriminatory) 36 (Plaintiff stating that "the United States alleges that the UCC's sprinkler provision for small homes for persons with disabilities is facially discriminatory")).   In this regard, Plaintiff's opposition brief relies primarily on Fifth Amendment takings cases holding that a facial claim is ripe upon passage of a regulation.  See (Doc. No. 18 at 40 (stating that "[f]acial challenges to the legality of regulations 'are generally ripe the moment the challenged regulation or ordinance is passed'" and "[t]hus, no 'final decision' as to any particular property is necessary")).  Plaintiff first cites Suitim v. Tahoe Regional Planning Agency, 520 U.S. 725 (1997), which found that a landowner's facial challenge asserting that an ordinance violated the Fifth Amendment takings clause was generally ripe the moment the challenged regulation was passed.  Plaintiff also cites County Concrete Corporation v. Township of Roxbury, 442 F.3d 159 (3d Cir. 2006), which held, in the context of a facial takings claim, a facial substantive due process claim, and a facial equal protection claim, that a final decision is not necessary because a landowner making a facial challenge argues that any application of the regulation is unconstitutional, and 431 E. Palisade Ave. Real Estate, LLC v. City of Englewood, No. 2:19-cv-14515, 2023 WL 6121195 (D.N.J. Sept. 19, 2023), in which a district court held that a complaint challenging a zoning ordinance as violating the FHA, the ADA, the RA, and 42 U.S.C. § 1983 was ripe because "the crux of the allegations amount[ed] to a facial challenge rather than a reasonable accommodation claim or as-applied challenge."  See id. at *4.

Defendants respond by stating that "Plaintiff's facial claim fails because it cannot be said that the sprinkler requirement is always discriminatory—indeed, Plaintiff['s] concession of how many facilities operate in Pennsylvania prove that the sprinkler requirement does not

discriminate." (Doc. No. 24 at 18.)  Defendants also quote the relief sought by Plaintiff in the wherefore clause of its complaint and state that "[c]ontrary to its 'facial' rhetoric—the [Plaintiff] uses the term more than 20 times in its [o]pposition [b]rief—these are requests for quintessential 'as-applied' relief".  See (Doc. No. 37 at 20–21).

The Third Circuit addressed the differences between claims seeking "facial" and "as-applied" relief (in the context of assessing the constitutionality of a particular statute) in Benezet Consulting LLC v. Secretary Commonwealth of Pennsylvania, 26 F.4th 580 (3d Cir. 2022).  The Third Circuit distinguished between the two types of relief as follows:

> Unlike facial relief, as-applied relief must contest a specific application of a law. In general, "the distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331, 130 S. Ct. 876, 175 L.Ed.2d 753 (2010).  That is, "[a]n 'as-applied' challenge is a claim that the operation of a statute is unconstitutional in a particular case while a facial challenge indicates that the statute may rarely or never be constitutionally applied."  16 C.J.S. Constitutional Law § 243; see also United States v. Huet, 665 F.3d 588, 600–01 (3d Cir. 2012) (noting that an as-applied attack contends that the a [sic] law is unconstitutional, not as written but rather in its application to a specific person under specific circumstances); United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010) (same).  The Supreme Court has also commented on the distinction, noting that as-applied relief must be limited to the specific plaintiffs and circumstances of the litigation.  Doe v. Reed, 561 U.S. 186, 130 S. Ct. 2811, 177 L.Ed.2d 493 (2010) ("Because [the] . . . claim and the relief that would follow—an injunction . . .—reach beyond the particular circumstances of these plaintiffs, they must satisfy this Court's standards for a facial challenge to the extent of that reach.")

See Benezet Consulting LLC, 26 F.4th at 585.

The Court concludes that, despite Plaintiff's labeling, the allegations of Plaintiff's complaint do not mount a "facial" challenge to the UCC automatic sprinkler requirement, but instead, "the crux of the allegations," see 431 E. Palisade Ave. Real Estate, LLC, 2023 WL 6121195, at *4, are in the vein of an "as-applied" challenge.  The plain language of the injunctive relief sought by Plaintiff reflects that the complaint does not allege that there is "no set of

40

circumstances" under which the regulation could be valid, see United States v. Stevens, 559 U.S. 460, 472 (2010) (citation omitted), given Plaintiff's request for an injunction prohibiting the enforcement of the UCC automatic sprinkler requirement and other heightened code requirements for community homes "except where it has been demonstrated that installation of automatic sprinklers and/or any other heightened code requirement under the UCC is warranted by the unique and specific needs of the residents of a particular community home."  (Doc. No. 1 at 22.)  The allegations of Plaintiff's complaint contemplate that there exist circumstances in which the automatic sprinkler requirement for community homes "and/or any other heightened code requirement under the UCC" may be warranted "by the unique and specific needs of the residents of a particular community home" and therefore the complaint does not seek to establish that "no set of circumstances" exists pursuant to which the automatic sprinkler requirement would be valid.  See Stevens, 559 U.S. at 472 (characterizing a "typical facial attack" as one seeking to establish that "no set of circumstances exists" pursuant to which a statute or regulation would be valid).  The Court agrees with Defendants that the relief sought by Plaintiff involves "fact-specific future inquiries" and so Plaintiff's complaint does not plausibly allege a "predominantly legal" question that can be conclusively resolved by any declaration of this Court.  See Plains, 866 F.3d at 542–43.[13]   For these reasons, the Court is similarly hard-pressed

---

[13]  As noted, the limited ripeness arguments in Plaintiff's opposition and supplemental briefs frame the issue as if Plaintiff's complaint asserts a "facial" claim challenging whether the automatic sprinkler regulation of Pennsylvania's UCC is inconsistent with the provisions of the Federal Housing Act, see, e.g., (Doc. No. 36 at 10 (arguing that "Defendants have put municipalities in an impossible situation, forcing them to choose between implementing and enforcing the UCC's blanket sprinkler requirement for all community homes and violating the federal FHA . . . or flouting the UCC's requirements and violating the UCC")); however, the nature of the relief sought by Plaintiff's "single claim" belies its arguments in this regard. Moreover, as noted by Defendants, Plaintiff's opposition brief references 42 U.S.C. § 3615 and several cases addressing preemption under the Supremacy Clause, see (Doc. No. 18 at 12–13, 17, 27, 29, 30), but its complaint asserts only a "single" pattern or practice claim pursuant to 42

to conclude that Plaintiff's complaint plausibly alleges that "the legal status of the parties" will be "changed or clarified" by the relief sought by Plaintiff.  See Plains, 866 F.3d at 542–43.   The "as-applied" nature of the relief sought by Plaintiff would appear to require the consideration of some particular factual situation arising in connection with a provider's application to a municipality for a certificate of occupancy for a particular community home and so any decision of this Court would resemble "an opinion advising what the law would be in a hypothetical set of facts."  See Plains, 861 F.3d at 543 (citation omitted).

The third factor assessed by the Step-Saver test is the "utility" of a judgment.  See id. "Practical utility goes to whether the parties' plans of actions are likely to be affected by a declaratory judgment . . . and considers the hardship to the parties of withholding judgment."  Id. at 543–44 (quoting N.E. Hub, 239 F.3d at 344–45).  For the same reasons discussed supra regarding the as-applied nature of the relief sought by Plaintiff and the accompanying lack of conclusiveness of the declaratory and injunctive relief sought, the Court finds the practical utility of a judgment lacking.  See id. at 544 (stating that "a judgment before [any further action is taken] would render the utility of a decision remote for the same reason a judgment would not be conclusive").

Accordingly, for the above reasons, the Court concludes that Plaintiff's complaint fails to "clearly allege facts" plausibly demonstrating a ripe claim sufficient to invoke this Court's jurisdiction.  See Ridge, 150 F.3d at 323.  Because the Court's conclusion that Plaintiff's complaint fails to plausibly allege a claim meeting Article III's ripeness requirement is

---

U.S.C. § 3614(a), not a preemption claim pursuant to 42 U.S.C. § 3615, as confirmed by Plaintiff's supplemental brief.  See (Doc. No. 36 at 8 & n.3 (referencing its claim brought pursuant to 42 U.S.C. § 3614(a) and noting that "Congress has also explicitly authorized the Attorney General to bring FHA violations to federal courts in other circumstances . . . but those are not implicated in this action")).

42

dispositive, the Court need not consider Defendants' arguments regarding Plaintiff's lack of standing under Federal Rule of Civil Procedure 12(b)(1) or failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6).

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss Plaintiff's complaint for lack of subject matter jurisdiction and close this case.[14]  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[14]  The Court notes that Plaintiff in its brief in opposition to Defendants' motion to dismiss does not request leave to file an amended complaint in the event the Court concludes that its complaint is subject to dismissal.